UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                    CRIMINAL ACTION NO. CR 3:16-CR-98-DJH

PABEL ANGUELA-VAZQUEZ
ANDRES TOMAS ALVAREZ HERNANDEZ                          DEFENDANTS

## SUPPLEMENTAL SENTENCING MEMORANDUM

### *ELECTRONICALLY FILED*

The United States, by counsel, Assistant United States Attorney, Joshua Judd, files its supplemental sentencing memorandum for the sentencing currently scheduled for December 1, 2017 at 10:30 a.m., in Louisville, Kentucky.  In this memorandum, the United States will address the issue of loss, sophisticated means, and the applicability of a role reduction.  The United States concedes it cannot prove 10 or more victims pursuant to USSG 2B1.1(b)(2)(A)(i).

The United States takes the position a sentence of 39 months and payment of restitution is appropriate for Defendant Alvarez Hernandez. Based on the low restitution amounts, the defendant should also be ordered to pay a fine of at least $7,500, the low-end of the range for a fine.  The United States takes the position a sentence of 42 months and payment of restitution is appropriate for Defendant Anguela-Vazquez.  Based on the low restitution amounts, the defendant should also be ordered to pay a fine of at least $7,500, the low-end of the range for a fine.

## I.  LOSS

### A.  RELEVANT CONDUCT 1B1.3(a)(1)(B)

Both defendants should be held responsible for the other defendants conduct in this conspiracy case.  U.S.S.G. § 1B1.3(a)(1)(B) ("Relevant Conduct (Factors that Determine the Guideline Range")) provides that the base offense level shall be determined by considering the following:

> [I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction.

Under the Sentencing Guidelines, a defendant is accountable for the conduct of other conspirators only if that conduct was (1) reasonably foreseeable to him and (2) in furtherance of the jointly undertaken criminal activity. United States v. Swiney, 203 F.3d 397, 402 (6th Cir. 2000).

During the change of plea, both defendants admitted they engaged in a conspiracy with each other.  Both defendants agreed to the following factual basis in open court and their plea agreements:

> [The defendants] agreed with each other to devise and execute a scheme to defraud financial institutions and people of money and property by stealing and illegally using other peoples' credit card information.  Anguela-Vazquez and Hernandez installed and harvested credit card skimming devices in gas pumps that were designed to collect gas purchaser's credit card information.  [The defendants] also used stolen credit card information to make purchases of goods and prepaid credit cards at Kroger and Meijer.

DN  68, Page ID# 208 (Plea Agreement Alvarez Hernandez), DN 71, Page ID# 223 (Plea Agreement Anguela-Vazquez).

Since both defendants engaged in skimming activity during the time of the conspiracy both should be held accountable for the conduct of the other defendant under the guidelines because it was both in furtherance of the criminal agreement and foreseeable to both defendants engaging in

this joint criminal endeavor.  The testimony during the sentencing hearing established that during the time period of the Superseding Indictment the following devices were recovered at the following locations:

| | |
|---|---|
| 6/12/2015 to 6/13/2015 | Skimming device A, HWY US 42, Prospect, KY |
| 6/24/2015 to 6/25/2015 | Skimming device B, HWY US 42, Prospect, KY |
| 10/6/2015 to 10/7/2015 | Skimming device D, Shelbyville Road, Louisville, KY |
| 10/6/2015 to 10/7/2015 | Skimming device E, Shelbyville Road, Louisville, KY |
| 4/13/2016 to 4/14/2015 | Skimming device F, HWY US 42, Prospect, KY |

The facts show that Anguela-Vazquez and Alvarez Hernandez had been skimming together as far back as June 2015, upon the discovery of Skimmer A.  As discussed below, both defendants are involved in all skimmers except B where we do not see Andres Alvarez Hernandez on camera.  Nevertheless, the conspiracy is ongoing at the time Skimmer B is retrieved and it should be foreseeable to Alvarez Hernandez given his involvement both before and after the installation and retrieval of Skimmer B.

Skimmer A:  On June 12, 2015 the FBI recovered Skimmer A from a gas station located on HWY 42.  A clerk at the station recovered the device and gave it to the FBI.  On June 12, 2015, about 9:30 p.m., surveillance video showed an individual believed to be Pabel Anguela-Vazquez get out of a silver Ford Edge registered to Andres Alvarez Hernandez.  The video showed Hernandez providing a distraction while the skimming device is installed.

Skimmer B:  On June 25, 2015, FBI recovered Skimmer B from a gas station clerk at a gas station on Highway 42.  The FBI reviewed the surveillance footage from the store and identified a Black Escalade arrive and defendant Pabel Aguela-Vazquez exit the vehicle and presumably install a credit card skimming device.  The video showed Defendant Anguela-Vazquez open pump number 4 at 10:08 p.m. on June 24, 2015.  The next day the FBI retrieved the device.  On June 28, surveillance video showed Defendant Vazquez open pump number 4, reach inside the

pump access door, and handle several cables looking for a skimming device that the FBI had already taken.

On or about October 1, 2015, Pabel Anguela-Vazquez used S.W.'s credit/debit card information without authorization to make purchases at Kroger located at 4211 South 3rd Street, Louisville, Kentucky, for $103.76 and $101.16.

Skimmers D and E:  On October 6, 2016, a white van pulled up to gas pumps 3 and 4 to install skimming devices in each pump around 9:15 p.m. at a gas station on Shelbyville RD.   A white van pulled up to pump 3 on video and seconds later it pulled up to pump 4.  During that time, a woman entered the store both times.  The FBI subsequently recovered Skimmers D and E from pumps 3 and 4, respectively.  On October 8, 2016, surveillance video from the store showed a white van arrive at the same pumps.  The video showed Anguela-Vazquez and Alvarez Hernandez.  The video also showed the pump door to pump 3 being opened by the two defendants. The defendants leave in the white van and returned to pump 4 and open the van doors block the view.  Hernandez stood by the door to obstruct the view from inside the store.

On or about October 25, 2015, Andres Tomas Alvarez Hernandez used A.L.'s credit/debit card information without authorization to make a purchase of a prepaid MasterCard credit card at Meijer in Jeffersonville, Indiana, for $206.95.   Hernandez conducted five credit card transactions using five different credit cards, and purchased five prepaid MasterCard credit cards at Meijer on October 25, 2015.

Skimmer F:  On April 14, 2016, the FBI recovered Skimmer F from a gas station on HWY 42. Store surveillance video from earlier that same day showed Defendants Anguela-Vazquez and Alvarez Hernandez installing Skimmer F around 8:32 p.m.  On April 16, 2016, surveillance video showed both defendants arrive in a white van.  Both defendants are easily identified on the video.

Anguela-Vazquez can be seen attempting to retrieve the skimming device while Hernandez stood between Anguela-Vazquez and the store.  Both men enter the vehicle and leave the area.

Each defendant should be held accountable for the offense conduct of the other, as it was both foreseeable and in furtherance of this bank fraud conspiracy to skim card numbers and use cloned cards to launder money.

## B.  GUIDELINE LOSS CALUCLATION

The sentencing guidelines have special rules to calculate the loss in cases involving access devices.  18 U.S.C. 1029(e)(1) broadly defines an access device as follows:

> An "access device" is defined as an  "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)."

18 U.S.C. 1029(e)(1).  It is well settled that each counterfeit and unauthorized access device results in an intended loss of $500 per access device or the amount of unauthorized charges that exceeds $500.  See U.S.S.G. § 2B1.1(b)(1) cmt. n. 3(F)(i).

The definition of a counterfeit or unauthorized access device is contained 18 U.S.C. 1029(e)(2) and (3).  The term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device.  The term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud.

Exhibit 29 demonstrated the number of access devices all specific numbers intercepted on each skimming device collected by the FBI.  Every single item collected by the illegal device contained numerical codes and credit card account numbers.   There were a total of 204 unique

numbers identified on skimming devices A, B, C, and D.  All of the numbers on the skimming devices were stolen at gas pumps and obtained from the same locations with the intent to defraud banks and the owner of the card of money. The FBI separate the types of information into different categories such as "Cards with Names" (172), "Cards with Identifiers" (19) and "Cards with no names/identifiers" (13).  In addition to those numbers, the defendants used 6 additional actual credit card numbers on cloned devices to unlawfully make purchases at Kroger and Meijer. Therefore, the total number of access devices is 210.  The total loss amount is 210 numbers multiplied by $500 loss per number totaling $105,000.

The "Cards with Names" accounts for credit card numbers with user's name associated with that number.  "Cards with Identifiers" contains credit and debit card numbers with some other identification such as business or government names associated with the card.  "Cards with no names/identifiers" covers numbers intercepted that constitute gift cards, prepaid cards, or gas discount cards.  There is no requirement that the government show access devices are usable.  See United States v. Moon, 808 F.3d 1085, 1092 (6th Cir. 2015).   This Court has sufficient evidence to make a finding that the numbers processed through the card reader at a gas pump constituted access devices.  This is true because there is no reason for consumers to swipe cards at the pump other than to transfer funds to complete the fuel purchase.  In addition, the defendants would not have been interested in intercepting this information if it was not valuable and usable to them.

The Court only need make a reasonable estimate of loss in this case.  See U.S.S.G. § 2B1.1(b)(1) cmt. n. 3(C).   Even assuming the "Cards with no names/identifiers" are not access devices, the remaining "Cards with Names" totaling 172 numbers plus "Cards with Identifiers" totaling 19 would result in a total of $95,500 (191 multiplied by $500).  Add in the remaining 6 credit card numbers that were actually used to commit fraud then we have a total of 197 cards

totaling loss of $98,500.  While the United States believes the loss amount is properly calculated at $105,000, another reasonable metric would be $98,500.  Therefore, the defendants should receive an 8 level increase under USSG 2B1.1(b)(1)(E) since the loss amount exceeds $95,000.

## II.  SOPHISTICATED MEANS

Both defendants used intricate and complex methods to carry out the offense and conceal it from detection by law enforcement and merchants.  Therefore, they should both receive an enhancement for the use of sophistication means under USSG 2B1.1(b)(10)(C).  The guideline provides:

> (10)(C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels.

The commentary discusses "sophisticated means" means as follows:

> Especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(10) cmt. n. 9(B).

Courts may consider the cumulative nature of the actions that make up a complex or intricate scheme to execute or conceal an offense in determining whether the sophisticate means enhancement applies. "A series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is especially complex or especially intricate." United States v. Masters, 216 Fed.Appx. 524, 525 (6th Cir. 2007) (internal quotation marks omitted). Repetitive,

coordinated steps can be sophisticated, even if no single step is particularly complex. United States v. Barrington, 648 F.3d 1178, 1179 (6th Cir. 2011).

Several cases in the Sixth and other Circuits have examined sophisticated means in the context of credit card fraud and skimming cases. In United States v. Finley, the Sixth Circuit held that sophisticated means enhancement applies based on the combined effect of the component parts of the conspiracy to effect and conceal the offense. 600 F. App'x 964, 967–68 (6th Cir. 2015). The factors supporting the holding included (1) traveling to another district where the stores were less familiar with the fraud; (2) switching license plates; (3) stealing stored-value cards; (4) converting numbers to cloned cards (either by encoding the cards themselves or outsourcing the job); (5) buying store gift cards at self-checkout lanes to avoid detection; (6) using the seemingly legitimate gift cards to buy expensive electronics; and (7) selling the loot. Id.

Another case in the Sixth Circuit upholding sophisticated means enhancement, United States v. Shifu Lin, presented a nearly identical credit card fraud scheme. 508 Fed.Appx. 398, 403 (6th Cir. 2012). In the Shifu Lin case, the defendant moved across jurisdictional boundaries and used technical knowledge to commit and conceal the offenses. Id. The defendant purchased credit-card numbers over the internet from Ukraine and Russia before encoding them on used gift cards and used the re-encoded gift cards to travel from Meijer store to Meijer store, purchasing gift cards at self-checkout lanes, before moving on to new stores in order to evade detection. Id. at 402–03 (6th Cir. 2012) (holding sophisticated means enhancement applicable).

In this case, Anguela-Vazquez and Alvarez Hernandez worked as a team to skim credit card numbers and separately to launder the proceeds to gift cards. As part of the executed and concealment of the offense, both defendants targeted gas stations without external surveillance cameras. The videos introduced as evidence show the defendants working together to create

diversions to conceal their access to the gas pumps.  The video exhibits show Alvarez Hernadez opening a car door and blocking the view while Anguela-Vazquez accessed the inside of the pump to locate skimming devices.  Alvarez Hernandez is standing right next to Anguela-Vazquez as he accessed the inside of the gas pump.  Alvarez Hernandez is as responsible for the installation and removal of the skimming device as Anguela-Vazquez.  While it is true, the United States does not have evidence that Alvarez Hernandez himself installed or put his hands on a device in a pump to remove it, Alvarez Hernandez is less than one foot away from Anguela-Vazquez while his is watching him manipulate the cables and wires located in the pump to retrieve and install the devices on more than one occasion.   The defendants were able to execute the scheme in a matter of seconds to install or attempt to retrieve skimmers.  The defendants were also able to access the pump and understand the configuration, so the pump would still work when used by unsuspecting consumers.  Understanding where to install the skimming device inside the wire demonstrates intricate knowledge not held by your average person.

There are three parts to this credit card fraud scheme:  (1) stealing card numbers, (2) re-encoding card numbers; and (3) laundering proceeds by using the card numbers to buy merchandise and gift cards.  Anguela-Vazquez and Alvarez Hernandez cannot deny they are involved in parts (1) and (3) in this scheme. As a point of logic, since both defendants are involved in stealing and using card information, it is highly likely that they are involved in reencoding the cards as well.  Nevertheless, even without evidence of the use of computers to download the information from the skimming devices, the actions in (1) and (3) would suffice to warrant the sophisticated means enhancement.

Alavarez Hernandez and Anguela Vazquez used reencoded cards in October 2015, which is same month they were skimming together on skimmers D and E.   Alvarez Hernandez traveled

outside of the Western District of Kentucky to Meijer located in Jeffersonville, Indiana to make purchases of gift cards at a Uscan lane.  Likewise, Anguela-Vazquez used a Uscan lane at Kroger to purchase merchandise and gift cards to avoid detection and launder the proceeds of fraud.  The conversion of re-encoded card funds to gift card funds adds another level of complexity to make it more difficult for law enforcement to uncover the person committing the fraud.  The defendants should be enhanced for sophisticated means to execute and conceal the offenses.

### III.      ROLE REDUCTION FOR ANDRES TOMAS ALVAREZ HERNANDEZ

This court should deny a role reduction under USSG 3B1.2 to either defendant.  The only evidence presented is that both defendants completed every aspect of the scheme as alleged in the indictment.  There is no evidence that they worked for someone else that was higher than them in the food chain in this conspiracy.  There is evidence that both defendants benefited by using cloned credit cards to launder money and make purchases of merchandise.  Because of the active engagement of both defendants in multiple instances of skimming and benefiting from the process of skimming by using cloned cards, they are nether minimal nor minor participants in criminal activity warranting a role reduction.

### IV.      GUIDELINES CALCULATIONS

The guidelines for both defendants should be calculated as follows:

| USSG 2B1.1(a)(1) | Base Offense | 7 |
| USSG 2B1.1(b)(1)(E) | Loss Amount | 8 |
| USSG 2B1.1(b)(10)(C) | Sophisticated Means | 2 |
| USSG 3E1.1 | Acceptance of Responsibility | -3 |
| USSG 2B1.6 | Aggravated ID Theft | +24 months |

The guideline range for Anguela-Vazquez with a criminal history category of II at Offense Level 14 is 18-21 months plus an additional consecutive 24 months for aggravated identity theft.

The low-end guideline range is 42 months imprisonment, a fine of $7,500, and up to 3 year supervised release.

The guideline range for Alvarez Hernandez with no criminal history and an Offense Level of 14 is 15-21 months plus an additional consecutive 24 months for aggravated identity theft.  The low-end guideline range is 39 months imprisonment, a fine of $7,500, and up to 3 years supervised release.

## V.        CONCLUSION

For the reasons set forth herein, the United States respectfully requests that the Court apply the Sentencing Guidelines, follow the statutory directives set out in 18 U.S.C. § 3553(a), and follow the government's recommendation, by imposing a sentences 39 months, a $7,500 fine, and payment of restitution is appropriate for Defendant Alvarez Hernandez, and a sentence of 42 months, a $7,500, and payment of restitution is appropriate for Defendant Anguela-Vazquez.

Respectfully submitted,

RUSSELL M. COLEMAN
United States Attorney


 s/Joshua Judd_____
Joshua Judd
Assistant U.S. Attorney
717 West Broadway
Louisville, Kentucky  40202
PH:  (502) 582-5911

### CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:  Patrick Renn, counsel for defendant Hernandez, and William Butler, Jr., counsel for Anguela-Vazquez.

 s/Joshua Judd_____

11

Joshua Judd
Assistant U.S. Attorney